## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

JESUS VENTURA, *et al.*,  )
)
              Plaintiffs,  )
)
        v.  )            Civil Action No. 08-621 (RCL)
)
BEBO FOODS, INC., *et al.*,  )
)
              Defendants.  )
_____)

## MEMORANDUM OPINION

On July 27, 2010, this Court granted plaintiffs' Motion for Summary Judgment, finding

defendant Roberto Donna ("Donna"), and corporate defendants SER, Inc. d/b/a Galileo

Restaurant, and RD Trattoria, Inc. d/b/a/ Bebo Trattoria Restaurant (collectively "defendants"),

liable to plaintiffs and collective plaintiffs for violations of the Free Labor Standards Act, 29

U.S.C.A. § 201, *et. seq.* ("FLSA"), the District of Columbia Wage Payment and Collection Law,

D.C. Code § 32-1301, *et. seq.* ("DCWPCL"), and the Equal Pay Act, 29 U.S.C.A. § 206(d).  The

Court conducted additional hearings on August 4, 2010, and August 24, 2010, to determine the

amount of damages.  Upon consideration of the applicable law and the entire record herein, the

Court will award plaintiffs and collective plaintiffs $526,893.16 for the reasons set forth below.

## I.      BACKGROUND

The Court incorporates by reference the findings of fact and law from its July 27, 2010

opinion granting summary judgment.  Jesus Ventura ("Ventura"), Rosa Rivas ("Rivas"),

Mohammed Douah ("Douah") (collectively, "plaintiffs"), were joined in this action by Arturo

Ramos ("Ramos"), Bisera Romic ("Romic"), Tulga Dorjgotov ("Dorjgotov"), Carlos Sosaya

("Sosaya"), Dorde Milojevic ("Milojevic"), Igor Vuckovic ("Vuckovic"), Marijuana Bosnijak

("Bosnijak"), Hicham El Hallou ("El Hallou"), and Elizabeth Scott ("Scott") (collectively, "collective plaintiffs"). Defendants employed plaintiffs and collective plaintiffs in various capacities at Galileo Restaurant ("Galileo") and Bebo Trattoria Restaurant ("Bebo") for various periods from 1992 to 2008. (Pls.' Mot. Summ. J. 2–4, ECF. No. 42; Pls.' Mot. J. Ex. 1, ECF No. 48.)

Over that time, defendants consistently failed to abide by their duties under federal and District of Columbia wage and hour laws. They rarely paid their employees on time and engaged in a persistent and widespread practice of issuing checks without signatures, issuing post-dated checks, and issuing checks despite insufficient funds in defendants' account. (*See, e.g.*, Pls.' Mot. Summ. J. Ex. C, Ventura Aff. ¶¶ 7–8, Scott Aff. ¶ 20; Compl. Ex. D, ECF No. 1.) Plaintiffs and collective plaintiffs ceased cashing paychecks at their own banks because the checks often bounced. (*See, e.g.*, Pls.' Mot. Summ. J. Ex. C, Ramos Aff. ¶ 22.) When defendants did pay their employees, the pay stubs did not indicate the correct number of hours worked. (*See, e.g.*, Pls.' Mot. Summ. J. Ex. C, Douah Aff. ¶ 6, Rivas Aff. ¶ 5.) Furthermore, defendants failed to pay overtime wages to employees who almost always worked more than forty hours per week. (*See, e.g.*, Pls.' Mot. Summ. J. Ex. C, Rivas Aff. ¶ 5, Sosaya Aff. ¶ 7; Compl. Ex. A.)

Although tipped employees took home approximately $150 to $200 in cash tips per week (*see, e.g.*, Ramos Test., August 4, 2010), defendants withheld significant portions of those employees' credit card tips (*see* Pls.' Mot. Summ. J. Ex. C). Defendants implemented a system whereby they paid all credit card tips in cash. (*See* R. Bonino Test., August 24, 2010.) Few restaurant patrons paid with cash, however, and defendants did not keep enough cash on hand to pay all of the credit card tips after each shift. (*Id.*) Although defendants made periodic

payments of the credit card tips owed to their employees, they owed several employees thousands of dollars at a time. (*See* Pls.' Mot. Summ. J. Ex. C.)

Defendants paid Ventura, a busser, $8.00 per hour. (*See* Compl. Ex. A.) Defendants only paid fellow busser Rivas $3.35 per hour, even though she performed the same amount and type of work as Ventura. (Rivas Aff. ¶ 4.) Defendants also failed to pay their salaried employees at the agreed-upon rates. (*See* Pls.' Hr'g Ex. 1–3, August 4, 2010; Pls.' Mot. Summ. J. Ex. C, El Hallou Aff. ¶¶ 6–7.) When plaintiffs and collective plaintiffs approached defendants about these pay practices, defendants explained that they withheld payments to pay the restaurant's expenses. (*See, e.g.*, Pls.' Mot. Summ. J. Ex. C, Romic Aff. ¶¶ 9–10.) Despite promising to quickly and fully reimburse their employees, defendants made no such recompense. (*See, e.g.*, Romic Aff. ¶ 10.)

When granting summary judgment, the Court found that defendants did not maintain proper payroll records pursuant to 29 U.S.C. § 211(c) (2006). (Mem. Op. Granting Pls.' Mot. Summ. J. 8, ECF No. 50.) The Court also found that plaintiffs' and collective plaintiffs' estimates of the hours they worked were reliable and supported by sufficient evidence. (*Id.* at 8–9.) The Court found all defendants liable for violations of the FLSA, DCWCPL, and EPA. (*Id.* at 1.) The Court, however, did not issue an award for damages at that time. When estimating their damages, plaintiffs and collective plaintiffs assumed that defendants paid them no wages, despite record evidence to the contrary. (*See, e.g.*, Scott Aff. ¶ 21; Pls.' Mot. J. Ex. 1.) The Court held two hearings to determine the amount of these wages and the amount of damages the Court should award plaintiffs and collective plaintiffs.

## II. LEGAL STANDARD

Because the Court has already found that defendants did not maintain proper payroll records pursuant to their obligations under 29 U.S.C. § 211(c) (2006), the Court may approximate damages under the FLSA based on "just and reasonable" inferences. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–88, *superseded by statute on other grounds*, Portal-to-Portal Act, Pub. L. No. 80-49, 61 Stat. 84. Indeed, when a defendant has not properly maintained employment records, a court will give the plaintiff's estimate of damages a strong presumption of validity, provided that the estimate is reasonably derived from the record. *See Arias v. U.S. Servs. Indus.*, 80 F.3d 509, 510–12 (D.C. Cir. 1996) (per curiam) (holding that the district court erred by not entering a judgment for the plaintiffs when the plaintiffs' uncontested estimate of damages was not "unduly speculative" and was pieced together from disparate "time cards, sign-in sheets, and payroll documents"). When assessing damages under the *Anderson* standard, a court may draw inferences from oral testimony, sworn declarations, and whatever relevant documentary evidence a plaintiff is able to provide. *See Pleitez v. Carney*, 594 F. Supp. 2d 47, 49 (D.D.C. 2009). Although a court's discretion under *Anderson* is broad, it is not unfettered. A court's inferences must be consistent with the evidence in the record. *Cf. Pleitez*, 594 F. Supp. 2d at 51 (inferring that the plaintiff was paid for time for which he made no specific claim of unpaid wages, in order to "maintain consistency in [plaintiff's] claims"). Generally, once the court has found that a defendant-employer has failed to abide by its record-keeping duties under the FLSA, the burden shifts to the defendant to present evidence refuting the plaintiff's estimate of damages. *Anderson*, 328 U.S. at 687–88.

When making findings and awarding damages under the DCWPCL, a court has substantially similar discretion. As under the FLSA, when a plaintiff has established a prima

facie case under the DCWPCL, the burden shifts to the defendant to produce evidence refuting

the plaintiff's claim. *See Nat'l Rifle Ass'n v. Ailes*, 428 A.2d 816, 821 (D.C. 1981) (finding that

when a plaintiff has established a right to accrued paid leave and has further established the

amount of leave accrued, the burden shifts to the defendant to prove "an agreement to the

contrary"). Federal courts in this Circuit have also implemented the just and reasonable standard

under *Anderson* when determining unpaid wages under the DCWPCL. *See Pleitez*, 594 F. Supp.

2d at 49–50 (awarding unpaid vacation pay based, in part, on plaintiff's recollection of his hourly

rate).

## III. ANALYSIS

Several elements of the FLSA and DCWPCL apply generally to all plaintiffs and

collective plaintiffs in this case. Thus, it is helpful to discuss those elements before engaging in

a more detailed discussion of individual damages.

### A. Collective Action under 29 U.S.C.A. § 216(b)

Ramos, Romic, Dorjgotov, Sosaya, Milojevic, Vuckovic, Bosnijak, El Hallou, and Scott

sought to join plaintiffs Ventura, Rivas and Douah in this action pursuant to 29 U.S.C.A § 216(b)

(West 1998 and Supp. 2010). (*See* Pls.' Mot. Summ. J. Ex. A.) It provides, in pertinent part,

that in an action to recover unpaid minimum wage and overtime wages under the FLSA:

> [T]he liability . . . may be maintained against any employer . . . by
> any one or more employees for and in behalf of himself or
> themselves and other employees similarly situated. No employee
> shall be a party plaintiff to any such action unless he gives his
> consent in writing to become such a party and such consent is filed
> in the court in which such action is brought.

29 U.S.C.A. § 216(b). Although the Court proceeded to grant summary judgment as though it

had declared that this action could be maintained as a collective action under 29 U.S.C.A. §

216(b) (*see* Mem. Op. Granting Pls.' Mot. Summ. J. 1–2), the Court never actually made that declaration.  So as to resolve any doubt, the Court finds that plaintiffs have satisfied the requirements of 29 U.S.C.A. § 216(b) and that this action was properly maintained, and will continue to be properly be maintained, as a collective action under the FLSA.

In plaintiffs' Motion for Summary Judgment, the collective plaintiffs submitted written statements consenting to join this action.  (*See* Pls.' Mot. Summ. J. Ex. A.)  This clearly satisfied the second requirement set forth in 29 U.S.C.A. § 216(b): that the parties file with this Court written consent to join the action.  The remaining issue, as the statute provides, is whether or not the plaintiffs and collective plaintiffs are "similarly situated."

District courts in the D.C. Circuit have identified and focused on three sets of factors when determining whether or not plaintiffs and collective plaintiffs are similarly situated for the purposes of the FLSA.  The first set of factors "involves an examination of the alleged activities of defendant."  *Hyman v. First Union Corp.*, 982 F.Supp. 1, 3 (D.D.C. 1997) (Lamberth, J.).  "If there is evidence that the alleged [wrongdoing] was part of a [sic] institution wide practice, such evidence would support use of a collective action."  *Id.*  The second set of factors focuses on the similarities of plaintiffs' and collective plaintiffs' employment.  These factors include the similarity of the employees' job responsibilities, compensation methods, and supervision.  *See id.* at 5 (finding that one factor in favor of allowing the plaintiffs' collective action was that plaintiffs only sought to add other "exempt line employees," like themselves, who had similar job responsibilities); *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 51 (3d Cir. 1989), *overruled in part on other grounds by Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089 (3d Cir. 1995) (affirming that whether or not employees were "employed in the same corporate department, division, and location" was one factor courts should consider when granting a

motion for a collective action under 29 U.S.C. § 216(b)).  *Cf. Hunter v. Sprint Corp.*, 346

F.Supp.2d 113, 119 (D.D.C. 2004) (Bates, J.) (noting that whether the employer classified

potential collective plaintiffs as either exempt or non-exempt from FLSA overtime requirements

created two distinct categories of plaintiffs, each with differing legal issues in the action).  The

final set of factors focuses on the "efficient resolution of common issues of law and fact arising

from the same alleged . . . activity."  *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170

(1989).  Among these factors, courts consider whether plaintiffs and collective plaintiffs "will

rely on common evidence to prove" the alleged wrongful employment practices, *Hyman*, 982

F.Supp. at 5, and "whether they all advanced similar claims" and "sought substantially the same

form of relief."  *Lockhart*, 879 F.2d at 51.

Turning to the instant case, plaintiffs and collective plaintiffs are similarly situated for the

purposes of the FLSA.  All plaintiffs and collective plaintiffs, with the exception of Scott, were

front-of-house staff working as servers, bussers, or floor managers.  (*See* Pls.' Mot. J. Ex. 1.)

Although front-of-house duties were not identical, defendants compensated front-of-house staff

in the same way—through base wages and tips.  Defendants, however, paid neither tips nor

wages in full, nor did they pay overtime wages.  (*See, e.g.*, Rivas Aff. ¶ 5; Pls.' Mot. Summ. J.

Ex. C.)  Although defendants paid Scott an annual salary, and although she served as defendant

Donna's personal assistant, she also periodically engaged in front-of-house duties at Bebo.  (*See*

Pls.' Mem. Opp'n to Defs.' Mot. to Dismiss Ex. 2, ECF No. 12; Scott Aff. ¶¶ 2, 6, Oct. 7, 2009.)

More fundamentally, however, defendants repeatedly issued deficient pay checks to all plaintiffs

and collective plaintiffs in this action.  (*See, e.g.*, Ventura Aff. ¶¶ 7–8, Scott Aff. ¶ 20, Oct. 7,

2009.)  Thus, as is the case with other plaintiffs and collective plaintiffs in this action, defendants

did not properly compensate Scott.

It is clear from the evidence that defendants' illegal pay practices were sufficiently widespread to weigh in favor of collective action. Additionally, the legal issues of the original plaintiffs' claims fall squarely upon whether defendants' failure to pay wages, overtime, and to distribute tips violates the provisions of the FLSA and the DCWPCL. The Court need not settle any other legal issue by adding the collective plaintiffs. It is also clear that plaintiffs and collective plaintiffs have relied, and will continue to rely on the same evidence in this action. Because the Court has broad discretion to make inferences from relevant circumstantial evidence in this case, the evidence on record applies equally to both plaintiffs and collective plaintiffs.

The Court therefore finds that plaintiffs and collective plaintiffs are similarly situated. Because each collective plaintiff has submitted written consent to join this action, the Court formally declares that this is a collective action under 29 U.S.C.A. § 216(b), and the Court will evaluate the damages for both the original plaintiffs and collective plaintiffs. For the sake of brevity and clarity, the Court will henceforth refer to the plaintiffs and collective plaintiffs, collectively, as "plaintiffs."

**B.      Minimum Wage and Overtime under the Fair Labor Standards Act**

The FLSA sets forth the minimum wage that employers engaged in interstate commerce must pay their employees. 29 U.S.C.A. § 206(a). Generally, determining the minimum wage is a straightforward process—the FLSA expressly states the minimum wage. *Id.* § 206(a)(1)(A)–(C). In a similarly straightforward fashion, the FLSA's overtime provision provides that employers engaged in interstate commerce must pay an employee at a rate of one and one-half times the employee's regular rate of pay for every hour over forty hours worked in a given workweek ("overtime hours"). *Id.* § 207(a)(1).

The FLSA modifies the minimum wage and overtime requirements for tipped employees. Tipped employees "customarily and regularly receive more than $30 a month in tips." 29 U.S.C.A. § 203(t). Tips, as they pertain to the FLSA, may be in the form of cash, an amount left on the merchant copy of a credit card receipt ("credit card tips"), or other means of compensation. *See* 29 C.F.R. § 531.53 (2010). The FLSA considers tips separate from wages. *See* 29 U.S.C.A. § 203(m). Although tipped employees must still receive the federal minimum wage set forth in 29 U.S.C.A. § 206(a), an employer need only pay its tipped employees $2.13 per hour, provided that the employees earn enough tips to earn the minimum wage after combining their tips and base wages. *See id.* § 203(m) (requiring employers taking a tip credit to pay half of the minimum wage in 1996); 29 U.S.C. § 206(a)(1) (2000). The difference between the minimum wage and the wages an employer pays its tipped employees is known as a "tip credit." *See* 29 C.F.R. § 531.59 (2010). To illustrate, the current minimum wage is $7.25 per hour. *See* 29 U.S.C.A. § 206(a). An employer paying its tipped employees $2.13 per hour takes a $5.12 tip credit. If an employer's tipped employees do not receive enough tips to bring their hourly rate to $7.25, the employer is required to claim a smaller tip credit and pay tipped employees more wages, so that the tipped employees receive the minimum wage. An employer may also take a tip credit with respect to overtime wages, although the tip credit taken for overtime hours may not exceed $5.12.[1]

The tip credit, however, is conditional. An employer may take a tip credit only if the employer has expressly informed its tipped employees that it is doing so, and it must allow those

---

[1] For example, a tipped employee working forty-five hours in a week is entitled to $344.40 (($7.25 x 40) + ($10.88 x 5)). For the first forty hours, the employer only needs to pay $2.13 per hour. It would be incorrect, however, to multiply $2.13 by 1.5 to get the rate the employer must pay for the overtime hours. That would result in the employer paying only $3.20 for each overtime hour, which would mean the employer takes a tip credit of $7.68 ($10.88 - $3.20). This amount is higher than the tip credit permitted by 29 U.S.C.A. § 203(m), which, even for overtime hours, is still the minimum wage less $2.13, or $5.12. Thus, for each hour worked over forty hours, the employer must pay $5.76 ($10.88 – $5.12). Adding regular and overtime wages, the employer must pay a total of $114 (($2.13 x 40) + ($5.76 x 5)).

tipped employees to retain all the tips they receive. 29 U.S.C.A. § 203(m). *See Martin v. Tango's Rest.*, 969 F.2d 1319, 1323 (1st Cir. 1992); *Richard v. Marriott Corp.*, 549 F.2d 303, 305 (4th Cir. 1977). Some courts, however, have allowed employers to withhold a limited portion of tips in order to recover costs associated with that type of tip. *See Myers v. Copper Cellar Corp.*, 192 F.3d 546, 554 (6th Cir. 1999) (finding no violation of the FLSA tip-retention requirement when an employer withheld a percentage of credit card tips equal to the percentage of credit card sales that credit card companies charged the employer). If an employer fails to comply with the tip credit requirements, the employer is liable to tipped employees for the difference between the minimum wage and the wage paid to tipped employees, regardless of the tips that tipped employees received. *See, e.g.*, *Chung v. New Silver Palace Rest., Inc.*, 246 F. Supp. 2d 220, 231 (S.D.N.Y. 2002) (awarding plaintiffs the difference between the federal minimum wage and the wage defendants paid them after first finding that defendants were not entitled to a tip credit).

Turning to the instant case, defendants took tip credits, paying their servers only $2.13 per hour and paying Rivas $3.35 per hour. (*See* Defs.' Hr'g Ex. 1, August 24, 2010; Rivas Aff. ¶ 4.) The Court finds that defendants have not met their obligations under the FLSA to claim a tip credit. Defendants distributed credit card tips in cash. (*See* R. Bonino Test., August 24, 2010.) Although defendants tried to distribute the credit card tips at the end of each shift, there was not enough cash on hand to pay each employee the credit card tips he or she earned. (*Id.*) As a result, defendants often withheld credit card tips for weeks at a time while keeping a spreadsheet tracking the accrued credit card tips owed to each employee. (*Id.*) These spreadsheets clearly show that defendants owed several employees thousands of dollars in outstanding credit card tips at a time. (*See* Pls.' Mot. Summ. J. Ex. C.)

The record reflects no legally acceptable reason for defendants to have withheld their employees' credit card tips. When confronted by their employees about their failure to pay wages, including tips, defendants said that they needed to withhold payment to cover the restaurant's operating expenses. (*See, e.g.*, Romic Aff. ¶ 10.) Defendants have not demonstrated that these operating expenses were caused by or related to the collection of credit card tips. Because defendants did not properly allow their tipped employees to retain their tips, they were not entitled to claim a tip credit against plaintiffs' wages.

Having wrongfully taken a tip credit, defendants are required to pay the difference between the federal minimum wage and the wages they paid the respective plaintiffs. *See* 29 U.S.C.A. § 216(b). At the very least, plaintiffs can recover the tip credit that defendants wrongfully took. For example, for each hour worked, plaintiffs employed as servers can recover the difference between the minimum hourly wage in effect at the time they were employed and the $2.13 hourly wage that defendants paid them.

Because defendants often failed to pay wages altogether plaintiffs are also entitled to minimum wage damages beyond the tip credit that defendants wrongfully took. Defendants frequently issued post-dated paychecks, unsigned paychecks, and paychecks that plaintiffs could not cash due to insufficient funds in defendants' account. (*See, e.g.*, Pls.' Mot. Summ J. Ex. B, Ex. C, Rivas Aff. ¶¶ 7–8; Scott Aff. ¶ 20.) When defendants issued paychecks that plaintiffs were unable to cash, defendants paid them nothing for those pay periods. Therefore, for those pay periods, they are liable to plaintiffs for the full minimum wage.

Plaintiffs' estimate of their damages, however, was remarkably less nuanced than defendants' pay practices would suggest. At the summary judgment stage, plaintiffs provided a breakdown of damages for each plaintiff, based on the duration of each plaintiff's employment,

the average hours per week each plaintiff worked, and the federal minimum wage rate supposedly in effect while each plaintiff worked for defendants. (*See* Pls.' Mot. J. Ex. 1.) The estimated damages for each plaintiff, however, were all prone to the same critical flaw: they did not account for any wages defendants paid plaintiffs. (*See id.*) In other words, plaintiffs assumed that because defendants did not meet the statutory requirements to take a tip credit, defendants were thus liable to plaintiffs in an amount equal to the entire minimum wage rate for each hour plaintiffs worked. Such an assumption is incongruous with the FLSA. The FLSA provides that employers who fail to pay their employees the required minimum wage or overtime wages are "liable to the employee or employees affected in the amount of their *unpaid* minimum wages, or their *unpaid* overtime compensation . . . ." 29 U.S.C.A. § 216(b) (emphasis added). This language strongly indicates that defendants are only liable for the difference between the minimum wage and those wages they *already paid* the plaintiffs. As discussed above, the Court's interpretation of the FLSA is consistent with relevant case law, *see supra* pp. 6–7, and thus the Court could only rely on plaintiffs' calculation of damages if it could find by just and reasonable inference that defendants completely failed to pay plaintiffs' wages.

The record does not show that defendants paid the plaintiffs no wages. Not a single plaintiff claimed that he or she had received no wages from defendants.[2] Scott stated in her affidavit that she cashed some paychecks. (Scott Aff. ¶ 21.) The Complaint also alleges that defendants admonished Ventura when he cashed multiple paychecks at once. (Am. Compl. ¶¶ 60–61, ECF No. 4.) Thus, although the Court found ample support in the record for the plaintiffs' estimates of hours and the duration of their employment, the Court could not simply

---

[2] Although many plaintiffs stated in their affidavits that their check amounts were "always zero" (*see, e.g.*, Douah Aff. ¶ 6), the Court gives these statements no weight. Several of the plaintiffs who made those statements submitted paychecks that, even if they could not be cashed due to some defect, showed positive dollar amounts. (*See* Pls.' Mot. Summ. J. Ex. B.)

award plaintiffs the damages laid out in their Motion for Judgment. (*See* Mem. Op. Granting Pls.' Mot. Summ. J. 8–9.) Additionally, the plaintiffs failed to properly calculate the minimum wage and, by extension, the overtime rate for minimum wage earners. When a particular plaintiff's employment spanned two different minimum wage periods, the plaintiffs broadly applied the later (and higher) minimum wage rate to the entire duration of employment. While *Anderson* grants the Court leeway to make certain evidentiary conclusions in FLSA actions, it grants no such leeway when the Court must make easily derived calculations.

In order to determine the wages defendants paid plaintiffs, the Court held two evidentiary hearings. The Court's instructions were clear: plaintiffs were required to "present an approximation of the damages that [took] into account the wages which they received" through "bank records, pay stubs, pay checks, or supplemental affidavits." (Mem. Op. Granting Pls.' Mot. Summ. J. 9).

Despite the Court's mandate, plaintiffs failed to provide an estimate of the wages they had received. Ramos and Vuckovic testified that they each took home between $150 and $200 in cash tips per week. (Ramos Test., August 4, 2010; Vuckovic Test., August 4, 2010.) Plaintiffs misconstrued the issue. As discussed above, the amount of tips an employee received is irrelevant when the employer *cannot claim a tip credit*. The only issue for determining minimum wage damages in this case is the amount of wages defendants paid plaintiffs.

Further complicating matters, defendants' evidence rebutting plaintiffs' estimate of damages was unreliable. Although defendants submitted their own estimates of what they owe plaintiffs, defendants derived these estimates from the payroll data they used to print plaintiffs' paychecks. (*See* Defs.' Hr'g Ex. 2, August 24, 2010.) Although this data shows the amounts of certain paychecks, neither the data nor defendants' estimates account for the paychecks that

plaintiffs were unable to cash. Defendants' estimates, for example, do not account for post-dated or unsigned checks. As the facts of this case demonstrate, there is a significant difference between issuing a paycheck and actually providing wages for employees. Their estimates address the former and neglect the later. Defendants' estimates and accompanying evidence are therefore unreliable, and the Court cannot give them weight.

Because plaintiffs did not offer an estimate of the wages defendants paid them, the Court must look to the record to determine such wages by just and reasonable inference. Several plaintiffs, in sworn affidavits, provide lump sums of "wages" that defendants still owe them. (*See, e.g.*, Pls.' Mot. Summ. J. Ex. C, Vuckovic Aff. ¶ 13.) From this figure, using the plaintiffs' estimates of employment duration and average hours worked per week, the Court could work backward to determine the wages defendants paid plaintiffs. It is doubtful, however, that plaintiffs have distinguished their "wages" from their tips. For example, Ramos states in his affidavit that he approached defendant Donna to discuss Donna's failure to pay "tipped wages." (Ramos Aff. ¶ 12.) Similarly, Vuckovic states in his affidavit that defendants owed him $12,000 in "wages," but explained in his testimony on August 4, 2010, that the $12,000 was all in outstanding credit card tips. (Vuckovic Aff. ¶ 13; *see* Vuckovic Test., August 4, 2010.) Because there is no other evidence suggesting that plaintiffs' claims for unpaid "wages" in their affidavits are limited solely to those they should have received in their paychecks, the Court cannot use these claims for the limited purpose of determining the wages defendants paid them.

As an alternative method to determining the total wages plaintiffs received, the Court could average the net wages distributed to each type of employee, based on the copies of paychecks that plaintiffs submitted. (*See* Pls. Mot. Summ. J. Ex. B.) The Court could then multiply those amounts by the total number of paychecks plaintiffs were able to cash.

That calculation, however, would require the Court to determine how frequently plaintiffs received their wages. This the Court cannot do. Plaintiffs do not even speculate, let alone stipulate, as to how frequently they were able to cash their paychecks. Further, there is little evidence in the record from which the Court can estimate how frequently plaintiffs were able cash their paychecks. Perhaps the most helpful statement came from Sosaya, who stated in his affidavit that during his year of employment, "there were several times I had 3–4 checks I was unable to cash." (Sosaya Aff. ¶ 12.) There is no indication in the affidavit, however, what "several" means. The record also casts some doubt as to what Sosaya means when he says that he was unable to cash the checks. Sosaya states that one defect of defendants' pay practices was that they often issued post-dated checks. (Sosaya Aff. ¶ 10.) It is possible that Sosaya was only temporarily unable to cash his paychecks during one of the several times he had accumulated multiple checks. Indeed, the complaint alleges that defendants admonished Ventura when he cashed multiple back-paychecks at once. (Am. Compl. ¶¶ 60–61.) Make no mistake; the Court does not believe that plaintiffs were able to cash their paychecks often. Without further guidance from plaintiffs, however, any estimate that this Court makes on the matter would be wholly arbitrary and beyond the discretion permitted under *Anderson*.

Because the Court can neither determine the wages plaintiffs received nor the frequency with which they were able to cash their paychecks, the Court will only award plaintiffs minimum wage damages in the amount of the federal minimum wage rate less the wage rate defendants paid them. Where plaintiffs have submitted copies of paychecks they could not cash, the Court will award those plaintiffs the full minimum wage for the time period each check represents, provided that such an award does not conflict with other claims for unpaid wages.

The deficiencies in plaintiffs' evidence requiring the Court to limit their damages for unpaid minimum wages have no effect on the Court's ability to award damages for unpaid overtime wages. Nearly all plaintiffs stated that their paystubs never accounted for the hours of overtime they worked and that, moreover, they were never properly compensated for that overtime. (*See, e.g.*, Sosaya Aff. ¶ 7; Rivas Aff. ¶ 5.) A copy of Ventura's paystub showing that, in a two-week pay period, Ventura worked 144.80 hours but no overtime hours substantiates these claims. (Compl. Ex. A.) In a two week pay-period, only eighty hours should have been regular; the rest of those hours should have been overtime. Using plaintiffs' estimates of the hours they worked per week, the Court can award plaintiffs the overtime rate to which they are entitled, minus the regular pay rate defendants paid them, for each overtime hour that they worked.

### C.      District of Columbia Wage Payment and Collection Law

The DCWPCL, D.C. Code § 32-1301, *et seq.* (2010), requires employers to pay their employees "at least twice during each calendar month, on regular paydays . . . provided, however, that an interval of not more than 10 working days may elapse between the end of the pay period covered and the regular payday." *Id.* § 1302. The DCWPCL also obligates employers to make timely payment of all outstanding wages owed to employees who quit, resign, or are released by the employer. *Id.* § 32-1303(1)–(2).

The DCWPCL broadly defines "wages" as "monetary compensation after lawful deductions, owed by an employer for labor or services rendered, whether the amount is determined on a time, task, piece, commission, or *other basis of calculation.*" *Id.* § 32-1301(3) (emphasis added). Although this definition does not expressly mention tips, the District of Columbia Court of Appeals has considered tips to be an element of compensation in other D.C.

labor provisions.  *See Mason v. D.C. Dep't of Emp't Servs.*, 562 A.2d 644, 646 (D.C. 1989) (finding tips to be an element of wages for computation of worker's compensation payment); *Gordon v. Dist. Unemp't Comp. Bd.*, 402 A.2d 1251, 1258 (D.C. 1979) (noting that for computation of unemployment benefits, wages include "all forms of compensation," including tips).

Thus, to the extent that plaintiffs have sufficiently proven late and outstanding payments, whether in the form of unpaid tips, wages, or salary, the Court may award those payments under the DCWPCL.  For the purposes of this case, the DCWPCL will generally only apply to: (1) outstanding wages plaintiffs claim in their affidavits; and (2) the unpaid wages represented by paychecks submitted by plaintiffs that they were unable to cash.

As noted above, the Court finds that stipulations in plaintiffs' affidavits as to outstanding wages represent some combination of unpaid tips and wages.  Except as otherwise noted, plaintiffs have submitted enough evidence to substantiate by reasonable inference that defendants owe them the outstanding amounts claimed in their affidavits.  Vuckovic stated in his affidavit that defendants owed him $12,000.  (Vuckovic Aff. ¶ 13.)  It was defendants, however, that asked Vuckovic during cross-examination to clarify that the amount he claimed was in the form of outstanding credit card tips.  (Vuckovic Test., August 24, 2010.)  Vuckovic confirmed this.  (*Id.*)  The spreadsheets tracking outstanding credit card tips show that defendants owed several plaintiffs thousands of dollars.  (*See* Pls.' Mot. Summ. J. Ex. C.)  Additionally, while plaintiffs still worked for defendants, defendants gave them print-outs showing how much defendants owed them.  (*See, e.g.*, Ventura Aff. ¶ 12; Ippolito Test., August 24, 2010.)  Defendants' pay practices were widespread and indiscriminate.  It is reasonable to presume the validity of the amounts plaintiffs claim, absent conflicting evidence in the record.  In addition to

providing estimates of plaintiffs' damages that the Court cannot validate, defendants have challenged plaintiffs' claims by making an unsubstantiated assertion that they had fully paid their employees at the time they shut down operations at Galileo and opened Bebo. But nearly every plaintiff claims unpaid wages for the time he or she worked at Bebo. Thus, defendants' assertion that their employees were paid in full when Bebo opened is irrelevant.

The paychecks plaintiffs submitted represent unpaid wages because they were not signed by defendants and could not be cashed. (*See* Pls.' Mot. Summ. J. Ex. C.) There is nothing in the record that indicates that defendants reissued checks or otherwise remedied the paychecks' deficiencies. Some plaintiffs have both claimed unpaid wages in their affidavits and submitted paychecks that they could not cash. In these cases, unless otherwise noted in this Court's discussion of individual plaintiff's damages, because the Court cannot determine the composition of the "wages" plaintiffs claim in their affidavits, the Court will only award the amount claimed in the affidavit. The Court thereby does not risk awarding the same unpaid wages twice. Where the Court can award the unpaid wages represented in paychecks that could not be cashed, the Court will award plaintiffs the hourly rate defendants paid them for each hour they estimated working during the respective pay period.

### D. Liquidated Damages

Both the FLSA and DCWPCL have liquidated damages provisions that apply here. The FLSA provides that an employer who violates the FLSA's minimum wage, equal pay, or overtime provisions "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C.A. § 216(b). Liquidated damages are not, however, mandatory in all FLSA cases:

> [I]f the employer shows to the satisfaction of the court that the act
>
> or omission giving rise to such action was in good faith and that he
>
> had reasonable grounds for believing that his act or omission was
>
> not a violation of the [FLSA] . . . the court may, in its sound
>
> discretion, award no liquidated damages or award any amount
>
> thereof not to exceed the amount specified in section 216 of this
>
> title.

29 U.S.C. § 260 (2006).

This Circuit has consistently emphasized that 29 U.S.C. § 260 requires more than a showing of good faith. In *Thomas v. Howard Univ. Hosp.*, 39 F.3d 370, 373 (D.C. Cir. 1994), the Court of Appeals distinguished good faith from the "reasonableness" discussed in § 260, noting that "liability for liquidated damages follows, unless the employer has a certain kind of excuse—a reasonable belief that its acts or omissions did not violate the law." The Court went on to emphasize that "[i]n most instances an employer will be able to satisfy § 260's 'reasonable grounds' requirement only if it has relied on a reasonable, albeit erroneous, interpretation of the [FLSA] or the regulations issued thereunder." *Id.*

In the instant case, defendants have offered no explanation as to why this Court should not award liquidated damages. They have not suggested that they believed they were in compliance with the FLSA, let alone given any reason for their noncompliance. Because defendants have not met their burden, the Court will award plaintiffs full liquidated damages under the FLSA.

The DCWPCL's liquidated damages clause only applies when employers fail to pay former employees the amounts owed to them. D.C. Code § 32-1303(4). In addition to amounts

owed, employers must also pay "10 per centum of the unpaid wages for each working day during which such failure shall continue after the day upon which payment is hereunder required, or an amount equal to the unpaid wages, whichever is smaller." *Id.* In the instant case, the later calculation represents the smaller liquidated damages award. Finally, unlike the FLSA, the DCWPCL contains no good faith exception. Thus, the plaintiffs to whom defendants owe outstanding wages are entitled to twice those wages under the DCWPCL's liquidated damages provision.

### E.    Consequential Damages and Prejudgment Interest

Plaintiffs also seek consequential damages and prejudgment interest, but neither is available under the FLSA or DCWPCL. As discussed above, the FLSA provides that for violations of its minimum wage and maximum hour provisions, plaintiffs may recover "the amount of their unpaid minimum wages, or their overtime compensation . . ., and in an additional equal amount as liquidated damages." 29 U.S.C.A. § 216(b). The statute also provides that a court shall "allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." *Id.*

Although Congress did not expressly state that § 216(b)'s remedies are exclusive, most courts have interpreted them as being so. *See, e.g.*, *Carter v. Marshall*, 457 F. Supp. 38, 40–41 (D.D.C. 1978) (finding that "[b]ecause the [FLSA] specifically outlines the type of relief available and also provides for liquidated damages, it appears that Congress intended the relief provided to be exclusive"); *Lerwill v. Inflight Motion Pictures, Inc.*, 343 F. Supp. 1027, 1028–29 (N.D. Cal. 1972) ("It should not require resort to Latin maxims of construction to show that the provision of one detailed remedy, which necessarily works to define the substantive right to be

enforced, would exclude the possibility of alternative remedies in the absence of a clear showing that Congress intended such alternatives to be provided by judicial construction").

Furthermore, in *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 715 (1945), the Supreme Court held that plaintiffs cannot not recover prejudgment interest under § 216(b) because the award of liquidated damages already serves to compensate them for damages arising from delayed payment.   Although the Portal-to-Portal Act, Pub. L. No. 80-49, 61 Stat. 84 (codified at 29 U.S.C. § 260 (2006)), signed into law after *O'Neil*, made liquidated damages discretionary, it has been the practice of courts in this Circuit to deny prejudgment interest under § 216(b) when a court awards a plaintiff the maximum amount of liquidated damages.  *See Lopez v. Rodriguez*, 688 F.2d 1376, 1381 n.10 (D.C. Cir. 1981); *Harrison v. District of Columbia*, 674 F. Supp. 34, 36 (D.D.C. 1987).

The DCWPCL uses similarly restrictive language when disclosing its remedies. Aggrieved employees may bring an action under the DCWPCL "to recover unpaid wages and liquidated damages."  D.C. Code § 32-1308(a). The DCWPCL later provides, however, that "in addition to any judgment awarded to the plaintiff" a court shall "allow costs of the action, including costs or fees of any nature, and reasonable attorney's fees, to be paid by the defendant."  *Id.* § 32-1308(b).  The Court has found no legislative history or case law that contradicts what is apparent on the face of the DCWPCL—that the remedies provided therein are exclusive.

Because the remedies provided in the FLSA and DCWPCL are exclusive, plaintiffs' claims for prejudgment interest and consequential damages will be denied.

### F.        Damages for Individual plaintiffs

#### i.        Igor Vuckovic

Vuckovic worked for defendants as a server at Bebo for ninety-seven weeks between January 2007 and November 2008.  (Pls.' Mot. J. Ex. 1, at 1.)  He worked an average of forty-eight hours per week and earned $2.13 per hour.  (*Id.*; Vuckovic Aff. ¶ 4.)  Over Vuckovic's ninety-seven weeks of employment, there were three different federal minimum wage rates.  From January 2007 to July 23, 2007—approximately twenty-nine weeks—the federal minimum wage was $5.15 per hour; from July 24, 2007, until July 23, 2008—approximately fifty-two weeks—the federal minimum wage was $5.85 per hour; from July 24, 2008, until November 2008—approximately sixteen weeks—the federal minimum wage was $6.55 per hour.  *See* 29 U.S.C.A. § 206(a).  For the first forty hours that Vuckovic worked each week ("regular hours"), because defendants improperly took a tip credit against Vuckovic's wages, Vuckovic is entitled to the difference between the federal minimum wage rate and the $2.13 rate defendants paid him.  *See* 29 U.S.C.A. § 216(b).  Table 1-1 lays out Vuckovic's minimum wage damages.

| *Table 1-1: Vuckovic Minimum Wage Damages* | |
|---|---|
| January 2007—July 23, 2007 (($5.15 - $2.13) x 40 hours x 29 weeks) | $3,503.20 |
| July 24, 2007—July 23, 2008 (($5.85 - $2.13) x 40 hours x 52 weeks) | $7,737.60 |
| July 24, 2008—November 2008 (($6.55 - $2.13) x 40 hours x 16 weeks) | $2,828.80 |
| Total Unpaid Minimum Wage | $14,069.60 |

Defendants failed to pay Vuckovic overtime wages for the overtime hours he worked.  (Vuckovic Aff. ¶ 4.)  Because defendants could not claim a tip credit and were thus required to pay Vuckovic the minimum wage, Vuckovic is entitled to the overtime rate for minimum wage earners, less the $2.13 rate defendants paid him, for each overtime hour that he worked.  *See* 29 U.S.C.A. § 216(b).  For the three different minimum wage time periods that he worked, the

overtime rate for minimum wage earners was $7.73, $8.78, and $9.83 per hour, respectively.  *See* 29 U.S.C.A. §§ 206(a), 207(a)(1).  Table 1-2 below lays out his overtime damages.

| *Table 1-2: Vuckovic Overtime Damages* | |
|---|---|
| January 2007—July 23, 2007 (($7.73 - $2.13) x 8 hours x 29 weeks) | $1,299.20 |
| July 24, 2007—July 23, 2008 (($8.78 - $2.13) x 8 hours x 52 weeks) | $2,766.40 |
| July 24, 2008—November 2008 (($9.83 - $2.13) x 8 hours x 16 weeks) | $985.60 |
| Total Unpaid Overtime | $5,051.20 |

Vuckovic stated in his affidavit that defendants owed him $12,000 in wages.  (Vuckovic Aff. ¶ 13.)  As noted, Vuckovic later confirmed that this amount was in the form of unpaid credit card tips.  (Vuckovic Test., August 4, 2010.)  Vuckovic is entitled to this amount under the DCWPCL.  *See* D.C. Code § 32-1303.  Vuckovic has also submitted copies of two paychecks that he was unable to cash because they were not signed.  (*See* Pls.' Mot. Summ. J. Ex. C.)  Each paycheck covered a two-week pay period.  (*See* Comp. Ex. D.)  Because he worked for forty-eight hours per week, the two checks represent 192 hours.[3]  At the rate of $2.13 per hour, Vuckovic is entitled to the $408.96 he should have received for the pay periods represented by the two paychecks he could not cash.[4]  *See* D.C. Code § 32-1303.  Because Vuckovic claims only outstanding credit card tips in his affidavit, there is no danger that the Court is awarding him the same unpaid wages by awarding him damages for both the amount claimed in his affidavit and the amount represented by the two paychecks he submitted.

Vuckovic is entitled to liquidated damages in an amount equal to his damages under both the FLSA and DCWPCL.  *See* 29 U.S.C.A. § 216(b); D.C. Code § 32-1303(4).  Table 1-3 lays out Vuckovic's total damages.

---

[3] 48 hours x 4 weeks

[4] $2.13 x 192 hours

| Table 1-3: Vuckovic Total Damages | |
|---|---|
| Unpaid Minimum Wage | $14,069.60 |
| Unpaid Overtime | $5,051.20 |
| Unpaid Credit Card Tips (DCWPCL) | $12,000.00 |
| Other Unpaid Wages (DCWPCL) | $408.96 |
| Subtotal | $31,529.76 |
| Liquidated Damages | $31,529.76 |
| Total | $63,059.52 |

### ii. Arturo Ramos

Ramos worked for defendants as a server at Bebo for forty-four weeks from September 1, 2007, to July 11, 2008.  (Pls.' Mot. J. Ex. 1, at 2.)  He worked an average of forty-eight hours per week and earned $2.13 per hour.  (*Id.*; Ramos Aff. ¶ 7.)  Over the course of his employment with defendants, the minimum wage was $5.85 per hour (overtime for minimum wage earners: $8.78 per hour).  *See* 29 U.S.C.A. §§ 206(a), 207(a)(1).  Because defendants improperly took a tip credit against Ramos's wages, Ramos is entitled to the difference between the federal minimum wage rate and the $2.13 rate defendants paid him.  *See* 29 U.S.C.A. § 216(b).  Because he worked forty regular hours over forty-four weeks, defendants owe Ramos $6,547.20 for unpaid minimum wage damages.[5]  Additionally, defendants never paid Ramos at the overtime rate for minimum wage earners for the eight overtime hours he worked per week.  (Ramos Aff. ¶ 8.)  He is therefore entitled to $6.65 per hour for each overtime hour he worked,[6] totaling $2,340.80 in unpaid overtime damages.[7]  *See* 29 U.S.C.A. § 216(b).

Finally, Ramos testified that defendants owed him $9,000 in unpaid credit card tips, an amount that defendants did not challenge during cross-examination.  (Ramos Test., August 4,

---

[5] ($5.85 - $2.13) x 40 hours x 44 weeks.

[6] $8.78 - $2.13

[7] ($8.78 - $2.13) x 8 hours x 44 weeks

2010.) Ramos is entitled to these damages under the DCWPCL. *See* D.C. Code § 32-1303.

Ramos may also recover liquidated damages in an amount equal to his damages under both the

FLSA and DCWPCL. *See* 29 U.S.C.A. § 216(b); D.C. Code § 32-1303(4). Table 2-1 lays out

his total damages.

| *Table 2-1: Ramos Total Damages* | |
| --- | --- |
| Unpaid Minimum Wage | $6,547.20 |
| Unpaid Overtime | $2,340.80 |
| Other Unpaid Wages (DCWPCL) | $9,000.00 |
| Subtotal | $17,888.00 |
| Liquidated Damages | $17,888.00 |
| Total | $35,776.00 |

### iii.    Bisera Romic

Romic worked for defendants as a server at Bebo for eighteen weeks from July 2008 to

October 27, 2008. (Pls.' Mot. J. Ex. 1, at 2). During that time, he worked an average of forty-

eight hours per week. (*Id.*) Although Romic does not provide his hourly rate, the Court may

reasonably infer that defendants paid him the same $2.13 hourly rate as other servers at Bebo.

(*See* Defs.' Hr'g Ex. 1, August 24, 2010.) During the course of Romic's employment with

defendants, there were two federal minimum wage rates. From July 1, 2008, to July 23, 2008—

approximately three weeks—the federal minimum wage was $5.85 per hour (overtime for

minimum wage earners: $8.78 per hour); from July 24, 2008, to October 27, 2008—

approximately fifteen weeks—the federal minimum wage was $6.55 per hour (overtime for

minimum wage earners: $9.83 per hour). *See* 29 U.S.C.A. §§ 206(a), 207(a)(1). Because

defendants improperly took a tip credit against Romic's wages, Romic is entitled to the

difference between the federal minimum wage rate and the $2.13 rate defendants paid him. *See*

29 U.S.C.A. § 216(b). Table 3-1 lays out his minimum wage damages.

| Table 3-1: Romic Minimum Wage Damages | |
|---|---|
| July 1, 2008—July 23, 2008 (($5.85 - $2.13) x 40 hours x 3 weeks) | $446.40 |
| July 24, 2008—October 27, 2008 (($6.55 - $2.13) x 40 hours x 15 weeks) | $2,652.00 |
| Total Unpaid Minimum Wage | $3,098.40 |

Because defendants failed to pay Romic overtime wages (Romic Aff. ¶ 8), he is entitled to the overtime rate for federal minimum wage earners, less the $2.13 rate defendants paid him, for each overtime hour that he worked. *See* 29 U.S.C.A. § 216(b). Table 3-2 lays out his overtime damages.

| Table 3-2: Romic Overtime Damages | |
|---|---|
| July 1, 2008—July 23, 2008 (($8.78 - $2.13) x 8 hours x 3 weeks) | $159.60 |
| July 24, 2008—October 27, 2008 (($9.83 - $2.13) x 8 hours x 15 weeks) | $924.00 |
| Total Unpaid Overtime | $1,083.60 |

Although Romic stated in his affidavit that he did not receive any credit card tips, he did not state how much defendants owe him. (*See* Romic Aff. ¶ 6.) Additionally, he is not listed on the credit card tip reports that plaintiffs submitted. (*See* Pls.' Mot. Summ. J. Ex. C.) Because the Court has no way to assess the amount of credit card tips defendants owe Romic, and because Romic has made no other claim for outstanding wages, the Court will not award him damages under the DCWPCL.

Romic is entitled to liquidated damages in an amount equal to his damages under the minimum wage and overtime provisions of the FLSA. *See* 29 U.S.C.A. § 216(b). Table 3-3 lays out his total damages.

| Table 3-3: Romic Total Damages | |
| --- | --- |
| Unpaid Minimum Wage | $3,098.40 |
| Unpaid Overtime | $1,083.60 |
| Subtotal | $4,182.00 |
| Liquidated Damages | $4,182.00 |
| Total | $8,364.00 |

### iv.   Tulga Dorjgotov

Dorjgotov worked for defendants as a server at Bebo for thirty-two weeks, from April 2008 to November 5, 2008.  (Pls.' Mot. J. Ex. 1, at 1.)  Over that time, he worked forty-eight hours per week.  (*Id.*)  Although he does not provide his hourly rate, the Court can reasonably infer that defendants paid him the same $2.13 rate they paid other servers at Bebo.  (*See* Defs.' Hr'g Ex. 1, August 24, 2010.)  While Dorjgotov worked for defendants, there were two federal minimum wage rates.  From April 1, 2008, until July 23, 2008—approximately sixteen weeks— the minimum wage was $5.85 per hour (overtime for minimum wage earners: $8.78 per hour); from July 24, 2008, to November 5, 2008—approximately sixteen weeks—the minimum wage was $6.55 per hour (overtime for minimum wage earners: $9.83 per hour).  *See* 29 U.S.C.A. §§ 206(a), 207(a)(1).  Because defendants improperly took a tip credit against Dorjgotov's wages, Dorjgotov is entitled to the difference between the federal minimum wage rate and the $2.13 rate defendants paid him.  *See* 29 U.S.C.A. § 216(b).  Table 4-1 lays out his minimum wage damages.

| Table 4-1: Dorjgotov Minimum Wage Damages | |
| --- | --- |
| April 1, 2008—July 23, 2008 (($5.85 - $2.13) x 40 hours x 16 weeks) | $2,380.80 |
| July 24, 2008—November 5, 2008 (($6.55 - $2.13) x 40 hours x 16 weeks) | $2,828.80 |
| Total Unpaid Minimum Wage | $5,209.60 |

Unlike the other plaintiffs, Dorjgotov has not asserted that defendants failed to pay him overtime wages.  Because he has effectively made no claim for unpaid overtime wages, the

Court will not award him overtime damages for the eight overtime hours per week that he worked.

Dorjgotov has also failed to stipulate as to other unpaid wages defendants still owe him, and he has not provided copies of paychecks that he was unable to cash. Thus, he is not entitled to additional damages under the DCWPCL. His damages are therefore limited to unpaid minimum wage damages under the FLSA and an equal amount in liquidated damages. *See* 29 U.S.C.A. § 216(b). Table 4-2 lays out Dorjgotov's total damages.

| *Table 4-2: Dorjgotov Total Damages* | |
|---|---|
| Unpaid Minimum Wage | $5,209.60 |
| Liquidated Damages | $5,209.60 |
| Total | $10,419.20 |

### v. Mohamed Douah

Douah worked for defendants as a server at Bebo for seventy-four weeks, from October 2006 to February 24, 2008. (Pls. Mot. J. Ex. 1, at 3.) Over that time, he worked forty-eight hours per week and earned $2.13 per hour. (*Id.*; *see* Compl. Ex. D.) While Douah worked for defendants, there were two federal minimum wage rates. From October 2006 until July 23, 2007—approximately forty-two weeks—the minimum wage was $5.15 per hour (overtime for minimum wage earners: $7.73 per hour); from July 24, 2007, to February 24, 2008— approximately thirty-two weeks—the minimum wage was $5.85 per hour (overtime for minimum wage earners: $8.78 per hour). *See* 29 U.S.C.A. §§ 206(a), 207(a)(1). Because defendants improperly took a tip credit against Douah's wages, Douah is entitled to the difference between the federal minimum wage rate and the $2.13 rate defendants paid him. *See* 29 U.S.C.A. § 216(b). Table 5-1 lays out his minimum wage damages.

| Table 5-1: Douah Minimum Wage Damages | |
| --- | --- |
| October 2006—July 23, 2007 (($5.15 - $2.13) x 40 hours x 42 weeks) | $5,073.60 |
| July 24, 2007—February 24, 2008 (($5.85 - $2.13) x 40 hours x 32 weeks) | $4,761.60 |
| Total Unpaid Minimum Wage | $9,835.20 |

Because defendants failed to pay Douah overtime wages (Douah Aff. ¶ 6), Douah is entitled to the overtime rate for federal minimum wage earners, less the $2.13 rate defendants paid him, for each overtime hour that he worked. *See* 29 U.S.C.A. § 216(b). Table 5-2 lays out his overtime damages.

| Table 5-2: Douah Overtime Damages | |
| --- | --- |
| October 2006—July 23, 2007 (($7.73 - $2.13) x 8 hours x 42 weeks) | $1,881.60 |
| July 24, 2007—February 24, 2008 (($8.78 - $2.13) x 8 hours x 32 weeks) | $1,702.40 |
| Total Unpaid Overtime | $3,584.00 |

Douah has also claimed that defendants owe him $16,965.24 in unpaid wages. (Douah Aff. ¶ 11.) But this amount, aside from being markedly greater than the amounts claimed by other plaintiffs, appears inconsistent with the record. Defendants' credit card tip report, dated March 7, 2008, and covering the final time period during which defendants employed Douah, shows that defendants only owed Douah $7,852.65 in unpaid credit card tips. (*See* Pls.' Mot. Summ. J. Ex. C.) The record in no way accounts for the additional $9,112.59 that Douah claims defendants still owe him. If defendants never paid Douah wages, they would owe him an additional $7,565.76.[8] Not only does this amount not fully account for the difference between the credit card tips and the amount Douah claims defendants owe him, but Douah has not claimed that defendants failed to pay him any wages. (*See generally* Douah Aff.) Because Douah's claim for outstanding wages is not reasonably related to the claims of his co-plaintiffs, and because it is not independently substantiated by just and reasonable inference from the

---

[8] $2.13 x 48 hours x 74 weeks

record, the Court will only award him $7,852.65 in unpaid credit card tips under the DCWPCL, as substantiated by defendants' credit card tip reports. *See* D.C. Code § 32-1303.

Because the Court is awarding the $7,852.65 in unpaid credit card tips based on defendants' credit card tip reports, as opposed to the vague claim for "wages" in Douah's affidavit, the Court can also award Douah damages under the DCWPCL for the three paychecks he submitted that he was unable to cash. (*See* Compl. Ex. D.) The biweekly paychecks account for six total weeks. Douah claimed to have worked for forty-eight hours per week and defendants paid him $2.13 per hour. Thus, he may recover $613.44 for the three paychecks he was unable to cash.[9] *See* D.C. Code § 32-1303.

Finally, Douah claims that he had to pay $2,800 in Social Security tax that defendants failed to pay on his behalf. (Douah Aff. ¶ 11.) Douah is not the only plaintiff who claimed that defendants failed to pay taxes on his or her behalf. Scott also testified that defendants, despite withholding income to allegedly pay taxes, also failed to pay those taxes on her behalf. (*See* Scott Test., August 4, 2010.) During cross-examination, defendants did not challenge her claim. (*Id.*) Under *Anderson*, this Court is entitled to infer that Scott's testimony sufficiently substantiates Douah's claim that defendants did not pay $2,800 in Social Security taxes on his behalf. Because defendants have made no effort to counter Douah's claim, the Court finds that defendants did not pay $2,800 in Social Security taxes that they withheld. Accordingly, Douah may recover the wrongfully withheld wages under the DCWPCL. *See* D.C. Code § 32-1303.

Douah is entitled to liquidated damages for his damages under both the FLSA and DCWPCL. *See* 29 U.S.C.A. § 216(b); D.C. Code § 32-1303(4). Table 5-3 lays out his total damages.

---

[9] 48 hours x 6 weeks x $2.13

| Table 5-3: Douah Total Damages | |
|---|---|
| Unpaid Minimum Wage | $9,835.20 |
| Unpaid Overtime | $3,584.00 |
| Other Unpaid Wages (DCWPCL) ($7,852.65 + $613.44 + $2,800.00) | $11,266.09 |
| Subtotal | $24,685.29 |
| Liquidated Damages | $24,685.29 |
| Total | $49,370.58 |

### vi.    Carlos Sosaya

Sosaya worked for defendants as a server at Bebo for fifty-two weeks from October 2007 to October 2008.  (Pls.' Mot. J. Ex. 1, at 3.)  Although Sosaya stated in his affidavit that he worked approximately forty-eight hours per week (Sosaya Aff. ¶ 3), plaintiffs later estimated that he only worked forty hours per week (Pls.' Mot. J. Ex. 1, at 3).  In this situation, the Court finds highly relevant the timing of Sosaya's affidavit.  Sosaya signed and dated his affidavit on April 27, 2010.  Plaintiffs appended Sosaya's affidavit to their Motion for Summary Judgment, which they submitted to the Court on May 17, 2010.  From May 17, 2010, to July 20, 2010—the date on which plaintiffs submitted their estimate of damages—neither party in this action submitted any evidence relating to the hours Sosaya worked.  In light of these circumstances, the Court will give deference to Sosaya's affidavit and award FLSA damages based on Sosaya's statement that he worked forty-eight hours per week.

Over the course of Sosaya's employment with defendants, there were two minimum wage rates.  From October 2007 to July 23, 2008—approximately forty weeks—the federal minimum wage was $5.85 per hour (overtime for minimum wage earners: $8.78 per hour); from July 24, 2008, until Sosaya ceased working for defendants in October 2008—approximately twelve weeks—the federal minimum wage was $6.55 per hour (overtime for minimum wage earners: $9.83 per hour).  *See* 29 U.S.C.A. § 206(a), 207(a)(1).  Because defendants improperly

took a tip credit against Sosaya's wages, Sosaya is entitled to the difference between the federal minimum wage rate and the $2.13 rate defendants paid him. *See* 29 U.S.C.A. § 216(b). Table 6-1 lays out his minimum wage damages.

| Table 6-1: Sosaya Minimum Wage Damages | |
|---|---|
| October 2007—July 23, 2008 (($5.85 - $2.13) x 40 hours x 40 weeks) | $ 5,952.00 |
| July 24, 2008—October 2008 (($6.55 - $2.13) x 40 hours x 12 weeks) | $ 2,121.60 |
| Total Unpaid Minimum Wage | $ 8,073.60 |

Because defendants failed to pay Sosaya overtime wages (Sosaya Aff. ¶ 7), he may recover the overtime rate for minimum wage earners, less the $2.13 rate defendants paid him, for each overtime hour he worked. *See* 29 U.S.C.A. § 216(b). Table 6-2 lays out her overtime damages.

| Table 6-2: Sosaya Overtime Damages | |
|---|---|
| October 2007—July 23, 2008 (($8.78 - $2.13) x 8 hours x 40 weeks) | $2,128.00 |
| July 24, 2008—October 2008 (($9.83 - $2.13) x 8 hours x 12 weeks) | $739.20 |
| Total Unpaid Overtime | $2,867.20 |

Sosaya states in his affidavit that defendants owe him $6,000 in unpaid wages. (Sosaya Aff. ¶ 14.) He can recover this amount under the DCWPCL. *See* D.C. Code § 32-1303. He is also entitled to liquidated damages in an amount equal to both his DCWPCL and FLSA damages. *See* 29 U.S.C.A. § 216(b); D.C. Code § 32-1303(4). Table 6-3 lays out his total damages.

| Table 6-3: Sosaya Total Damages | |
|---|---|
| Unpaid Minimum Wage | $8,073.60 |
| Unpaid Overtime | $2,867.20 |
| Other Unpaid Wages (DCWPCL) | $6,000.00 |
| Subtotal | $16,940.80 |
| Liquidated Damages | $16,940.80 |
| Total | $33,881.60 |

### vii.    Marijana Bosnjak

Bosnjak worked for defendants as a server at Bebo for twenty-seven weeks from July 2008 to December 2008.  (Pls.' Mot. J. Ex. 1, at 4.)  Over that time, she worked sixty hours per week.  (*Id.*)  Although Bosnjak has not provided her hourly rate, the Court can infer that defendants paid Bosnjak the same $2.13 rate they paid other servers at Bebo.  (*See* Defs.' Hr'g Ex. 1, August 24, 2010.)  While Bosnjak worked for defendants, there were two federal minimum wage rates. From July 1, 2008, to July 23, 2008—approximately three weeks—the federal minimum wage was $5.85 per hour (overtime for minimum wage earners: $8.78 per hour); from July 24, 2008, to December 31, 2008—approximately twenty-four weeks—the federal minimum wage was $6.55 (overtime for minimum wage earners: $9.83 per hour).  *See* 29 U.S.C.A. §§ 206(a), 207(a)(1).  Because defendants improperly took a $2.13 tip credit against Bosnjak's wages, Bosnjak is entitled to the difference between the federal minimum wage rate and the $2.13 rate defendants paid her for each regular hour worked.  *See* 29 U.S.C.A. § 216(b). Table 7-1 lays out her minimum wage damages.

| *Table 7-1: Bosnjak Minimum Wage Damages* | |
| --- | --- |
| July 1, 2008—July 23, 2008 (($5.85 - $2.13) x 40 hours x 3 weeks) | $446.40 |
| July 24, 2008—December 31, 2008 (($6.55 - $2.13) x 40 hours x 24 weeks) | $4,243.20 |
| Total Unpaid Minimum Wage | $4,689.60 |

Because defendants also failed to pay Bosnjak overtime wages (Pls.' Mot. Summ. J. Ex. C, Bosnjak Aff. ¶ 5), Bosnjak may recover the overtime rate for minimum wage earners, less the $2.13 rate defendants paid her, for each overtime hour she worked.  *See* 29 U.S.C.A. § 216(b). Table 7-2 lays out her overtime damages.

| Table 7-2: Bosnjak Overtime Damages | |
|---|---|
| July 1, 2008—July 23, 2008 (($8.78 - $2.13) x 20 hours x 3 weeks) | $399.00 |
| July 24, 2008—December 31, 2008 (($9.83 - $2.13) x 20 hours x 24 weeks) | $3,696.00 |
| Total Unpaid Overtime | $4,095.00 |

Bosnjak also stated that defendants failed to pay her $5,500 in wages. (Bosnjak Aff. ¶ 11.) She can recover this amount under the DCWPCL. *See* D.C. Code § 32-1303. Bosnjak is also entitled to recover liquidated damages in an amount equal to the damages awarded under both the FLSA and DCWPCL. *See* 29 U.S.C.A. § 216(b); D.C. Code § 32-1303(4). Table 7-3 lays out her total damages.

| Table 7-3: Bosnjak Total Damages | |
|---|---|
| Unpaid Minimum Wage | $4,689.60 |
| Unpaid Overtime | $4,095.00 |
| Unpaid Other Wages (DCWPCL) | $5,500.00 |
| Subtotal | $14,284.60 |
| Liquidated Damages | $14,284.60 |
| Total | $28,569.20 |

### viii.    Dorde Milojevic

Milojevic worked for defendants as a server at Bebo for twenty-two weeks from June 12, 2008, to November 2008. (Pls. Mot. J. Ex. 1, at 4.) He worked sixty hours per week. (*Id.*) Although Milojevic has not provided his hourly rate, the Court can infer that defendants paid Milojevic the same $2.13 rate they paid other servers at Bebo. (*See* Defs.' Hr'g Ex. 1, August 24, 2010.) While he worked for defendants, there were two federal minimum wage rates. From June 12, 2008, until July 23, 2008—approximately five weeks—the federal minimum wage was $5.85 per hour (overtime for minimum wage earners: $8.78 per hour); from July 24, 2008, until November 2008—approximately seventeen weeks—the federal minimum wage was $6.55 (overtime for minimum wage earners: $9.83 per hour). *See* 29 U.S.C.A. §§ 206(a), 207(a)(1).

Because defendants improperly took a $2.13 tip credit against Milojevic's wages, Milojevic is entitled to the difference between the federal minimum wage rate and the $2.13 rate defendants paid him for each regular hour that he worked. *See* 29 U.S.C.A. § 216(b). Table 8-1 lays out his minimum wage damages.

| *Table 8-1: Milojevic Minimum Wage Damages* | |
|---|---|
| June 12, 2008—July 23, 2008 (($5.85 - $2.13) x 40 hours x 5 weeks) | $744.00 |
| July 24, 2008—November 2008 (($6.55 - $2.13) x 40 hours x 17 weeks) | $3,005.60 |
| Total Unpaid Minimum Wage | $3,749.60 |

Because defendants failed to pay Milojevic overtime wages (Pls.' Mot. Summ. J. Ex. C, Milojevic Aff. ¶ 7), he may collect the overtime rate for federal minimum wage earners, less the $2.13 rate defendants paid him, for each overtime hour that he worked. *See* 29 U.S.C.A. § 216(b). Table 8-2 lays out his overtime damages.

| *Table 8-2: Milojevic Overtime Damages* | |
|---|---|
| June 12, 2008—July 23, 2008 (($8.78 - $2.13) x 20 hours x 5 weeks) | $665.00 |
| July 24, 2008—November 2008 (($9.83 - $2.13) x 20 hours x 17 weeks) | $2,618.00 |
| Total Unpaid Overtime | $3,283.00 |

Milojevic also stated in his affidavit that defendants owed him $6,500 in unpaid wages. (Milojevic Aff. ¶ 14.) He can recover this amount under the DCWPCL. *See* D.C. Code § 32-1303. He is also entitled to recover liquidated damages in an amount equal to his damages under both the FLSA and DCWPCL. *See* 29 U.S.C.A. § 216(b); D.C. Code § 32-1303(4). Table 8-3 lays out his total damages.

| Table 8-3: Milojevic Total Damages | |
|---|---:|
| Unpaid Minimum Wage | $3,749.60 |
| Unpaid Overtime | $3,283.00 |
| Unpaid Credit Card Tips (DCWPCL) | $6,500.00 |
| Subtotal | $13,532.60 |
| Liquidated Damages | $13,532.60 |
| Total | $27,065.20 |

### ix.    Jesus Ventura

As a threshold matter, the Court must determine when Ventura stopped working for defendants.  In his affidavit, Ventura states that he ceased working for defendants in December 2006.  (Ventura Aff. ¶ 2.)  Plaintiffs relied on his statement when estimating Ventura's damages.  (*See* Pls.' Mot. J. Ex. 1, at 5.)  In their amended complaint, however, plaintiffs state that Ventura worked for defendants until November 2007.  (Am. Compl. ¶¶ 25–26.)  They have also provided a copy of Ventura's time card, dated November 11, 2007, and three paychecks that Ventura was unable to cash, two of which were dated December 2007.  (Compl. Exs. A, D.)  The evidence in the record clearly establishes that Ventura was employed by defendants in December 2007.  For the purposes of estimating the duration of Ventura's employment with defendants, the Court finds that he terminated his employment with them in December 2007.

Ventura began work as a busser at Galileo in February 1992, transferred to Bebo when Galileo closed in 2006, and continued to work as a busser at Bebo until December 2007.  (*See* Pls.' Mot. J. Ex. 1, at 5; Compl. Ex. D.)   The statute of limitations under both the DCWPCL and FLSA, however, is only three years.  *See* 29 U.S.C. § 255(a) (2006); D.C. Code § 32-1013.  Because plaintiffs filed their complaint on April 11, 2008, Ventura may only recover for FLSA and DCWPCL violations that occurred on or after April 11, 2005, up through the end of his employment with defendants in December 2007, a span of 142 weeks.

Ventura's case differs from the other plaintiffs in this case because defendants paid him $8.00 per hour (*see* Compl. Ex. A), a rate much higher than the federal and District of Columbia[10] minimum wage rates in effect between April 11, 2005, and December 2007. *See* 29 U.S.C.A. § 206(a); D.C. Code § 32-1003(a). Although Ventura's rate of pay precludes him from recovering minimum wage damages under the FLSA, it raises his overtime rate beyond that of his fellow plaintiffs. The overtime rate is one-and-one-half times an employee's regular rate of pay. *See* 29 U.S.C.A. § 207(a)(1). Because Ventura's regular rate of pay was $8.00 per hour, defendants were required to pay him $12.00 per hour for each overtime hour he worked. Because defendants failed to pay Ventura overtime wages for his overtime hours (Ventura Aff. ¶ 5), he may collect the difference between the overtime rate to which he was entitled and the $8.00 rate defendants paid him. *See* 29 U.S.C.A. § 216(b). He worked sixty-five hours per week over 142 weeks for defendants, and he is thus entitled to $14,200 in unpaid overtime wages.[11] He is also entitled to an equal amount in liquidated damages. *See id.*

Ventura has also submitted paychecks that he was unable to cash. (*See* Comp. Ex. D.) Ventura stated in his affidavit, however, that defendants owe him $40,767 in unpaid wages. (Ventura Aff. ¶ 12.) The Court notes that in his affidavit, Ventura was discussing the entire sixteen years he worked for defendants. Unlike plaintiffs' Motion for Judgment, in which plaintiffs' counsel specified that they were calculating Ventura's damages based on the ninety weeks of employment within the statute of limitations, Ventura makes no such distinction in his

---

[10] The District of Columbia minimum wage provisions apply only to employees who "regularly spend[] more than 50% of their working time in the District of Columbia." D.C. Code § 32-1003(b)(1) (2010). Ventura is the only plaintiff who fits this definition of employee because he is the only plaintiff who spent enough time working within the District of Columbia to qualify. The other employees limit their claims to the time they worked at Bebo, located in Virginia.

[11] $4.00 x 25 hours x 142 weeks

affidavit.  (*Compare* Pls.' Mot. J. Ex. 1, at 5 *with* Ventura Aff.)  Thus, the Court does not find it appropriate to award Ventura the full $40,767 under the DCWPCL.

Ventura, however, worked for defendants for fifteen years and ten months (15.83 years).  Assuming that defendants accumulated their debt to Ventura evenly over the course of his employment, which would be reasonable given that greater or lesser amounts in a given year would average out over time, defendants would have accumulated $2,575.30 in debt to Ventura each year.[12]  The Court finds this to be a reasonable estimate.  Defendants consistently failed to pay plaintiffs both wages and credit card tips.  The credit card tip report listing Ventura shows that he earned $738.96 over a ten-day span.  (*See* Compl. Ex. C.)  If defendants failed to pay those tips, or only partially paid them, they could easily have failed to pay Ventura $2,575.30 over the course of a year.  To boil the estimate down further, defendants would have failed to pay Ventura $49.53 per week.[13]  Thus, over the 142 weeks that Ventura worked for defendants within the statute of limitations, defendants would have owed Ventura $7,033.26 in unpaid wages.[14]  Ventura is entitled to these wages under the DCWPCL.  *See* D.C. Code § 32-1303.

Defendants have asserted, however, that they had paid all employees at Galileo, including Ventura, in full by the time it closed in 2006.  If this assertion is true, the Court would have to reduce Ventura's DCWPCL award to exclude the time he worked at Galileo.  To support their assertion, defendants presented the testimony of Philip Proulx, a part-time bookkeeper at both Galileo and Bebo, and the affidavit of Mario Mellusi, the manager at Galileo at the time it closed.  Both the testimony and the affidavit suffer from the same flaw—neither finds enough

---

[12] $40,767.00 ÷ 15.83 years

[13] $2,575.30 ÷ 52 weeks

[14] $49.53 x 142 weeks

support in the record to overcome the cumulative weight of plaintiffs' evidence demonstrating the prevalent nature of defendants' pay practices.

Both Prolux and Mellusi made plain, simple statements that defendants paid Galileo employees, including Ventura, in full by the time the restaurant closed. (*See* Prolux Test., Aug. 24, 2010; Defs.' Hr'g Ex. 3, Mellusi Aff., Aug. 24, 2010.) Plaintiffs, however, have submitted ample evidence showing that defendants deliberately disregarded their legal obligations to pay their employees. Defendants engaged in pay practices that were widespread and not motivated by any particular factor. Although plaintiffs' evidence primarily focuses on defendants' pay practices at Bebo, it establishes by just and reasonable inference that defendants' pay practices at Galileo were equally suspect. Neither Prolux's nor Mellusi's statement, without more, dispels this inference. Because defendants have not submitted additional records corroborating their claim that they had paid Ventura in full by the time he transitioned from Galileo to Bebo, defendants have not met their burden to overcome the Court's finding that Ventura is entitled to $7,033.26 in unpaid wages under the DCWPCL. The Court will therefore award that amount. Ventura may also recover an equal amount in liquidated damages. *See* D.C. Code § 32-1303(4).

Finally, because the Court cannot determine the allocation of tips and wages within Ventura's claim in his affidavit, the Court will not award damages for the three paychecks that he could not cash. The Court thereby avoids the risk of compensating Ventura for the same unpaid wages twice. Table 9-1 lays out Ventura's total damages.

| *Table 9-1: Ventura Total Damages* | |
|---|---|
| Unpaid Overtime | $14,200.00 |
| Unpaid Wages (DCWPCL) | $7,033.26 |
| Subtotal | $21,233.26 |
| Liquidated Damages | $21,233.26 |
| Total | $42,466.52 |

### x.     Rosa Rivas

Rosa Rivas worked for defendants as a busser at Bebo for fifty-nine weeks from October 2006 to November 2007.  (Pls.' Mot. J. Ex. 1, at 5.)  Over that time she earned $3.35 per hour, and worked seventy hours per week.  (*Id.*; Rivas Aff. ¶ 4.)  Defendants never paid her overtime wages.  (Rivas Aff. ¶ 5.)  Regardless of whether defendants did not permit her to retain enough tips to qualify as a "tipped employee" under the FLSA, or whether defendants were not permitted to take a tip credit, defendants were required to pay Rivas the federal minimum wage for the regular hours that she worked.

Because the Court has found that defendants violated the Equal Pay Act, 29 U.S.C.A. § 206(d), it must calculate Rivas' damages for unpaid minimum wage and overtime wages differently from other tipped employees.  Defendants paid Ventura $8.00 per hour while only paying Rivas $3.35 per hour, despite the fact that both did the same type and amount of work. Under the EPA, Rivas is entitled to the difference between the $8.00 per hour defendants paid Ventura and the $3.35 per hour they paid her, or $4.65.  These damages, however, overlap with both her minimum wage and overtime damages.  The EPA provides that "[f]or purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of [the EPA] shall be deemed to be *unpaid minimum wages or unpaid overtime compensation under this chapter*."  29 U.S.C.A. § 206(d)(3) (emphasis added).  The $4.65 per hour to which Rivas is entitled under the EPA is greater than the rate she would otherwise be able to recover in unpaid minimum wages.[15]  Thus, her EPA damages subsume her minimum wage damages.  Accordingly, for defendants' violations of both the minimum wage provisions

---

[15] As an example, when Rivas ceased working for defendants in November 2007, the federal minimum wage was only $5.85 per hour.  *See* 29 U.S.C.A. § 206(a).  Rivas would have normally been entitled only to the difference between the federal minimum wage rate and the $3.35 rate defendants paid her, or $2.50.

and equal pay provisions of the FLSA, Rivas is entitled to $4.65 for each regular hour she worked. Because she worked forty hours per week over the course of fifty-nine weeks, the Court will award Rivas $10,974 in "minimum wage" damages.[16]

The Court must also use the discrepancy between Ventura's and Rivas's pay to determine her unpaid overtime wages. *See* 29 U.S.C.A. § 206(d)(3). Because the EPA's purpose is to ensure that the pay between men and women doing the same work is equal, the Court calculates Rivas's overtime rate as the difference between the overtime rate Ventura should have been paid, to which Rivas was likewise entitled, and the rate Rivas was actually paid for her overtime hours. As discussed above, Ventura should have been paid $12.00 for each overtime hour. Therefore, for the thirty overtime hours Rivas worked per week, she is entitled to $8.65 per hour.[17] Because she worked thirty overtime hours each week for fifty-nine weeks, the Court will award Rivas $15,310.50 in unpaid "overtime" wages.[18]

Rivas also claims that defendants owe her $3,500 in unpaid wages. (Rivas Aff. ¶ 12.) Rivas is entitled to these wages under the DCWPCL. *See* D.C. Code § 32-1303. Because the Court is awarding these damages, however, it cannot grant her the amounts represented by the paychecks she submitted that could not be cashed. (*See* Pls.' Mot. Summ. J. Ex. B.) The Court cannot determine the allocation of tips and wages in the claim in her affidavit. To avoid awarding the same unpaid wages twice, the Court will award Rivas the amount stated in her affidavit and disregard the paychecks she submitted.

Rivas is entitled to liquidated damages under the FLSA, EPA, and DCWPCL. *See* 29 U.S.C.A. § 216(b); D.C. Code § 32-1303(4). Table 10-1 lays out her total damages.

---

[16] $4.65 x 40 hour x 59 weeks

[17] $12.00 - $3.35

[18] $8.65 x 30 hours x 59 weeks

| *Table 10-1: Rivas Total Damages* | |
|---|---|
| Unpaid Minimum Wage | $10,974.00 |
| Unpaid Overtime | $15,310.50 |
| Unpaid Wages (DCWPCL) | $3,500.00 |
| Subtotal | $29,784.50 |
| Liquidated Damages | $29,784.50 |
| Total | $59,569.00 |

### xi. Hical El Hallou and Elizabeth Scott

El Hallou and Scott claim damages only for unpaid wages under the DCWPCL. (*See* Pls.' Mot. J. Ex. 1, at 6.) Both were salaried employees—El Hallou was a floor manager at Bebo and Scott was Donna's personal assistant. (*Id.*) Defendants owe El Hallou $7,200 in unpaid wages, and defendants owe Scott $10,609.34 in unpaid wages. (*Id.*) Both El Hallou and Scott are entitled to these wages under the DCWPCL and an equal amount in liquidated damages. *See* D.C. Code § 32-1303. Accordingly, the Court will award El Hallou $14,400, and Scott $21,218.68.

### G. Attorneys' Fees

A plaintiff is entitled to reasonable attorneys' fees and costs under both the FLSA and DCWPCL. *See* 29 U.S.C.A. § 216(b); D.C. Code. § 32-1308(b). Well aware of this entitlement, plaintiffs in this case have submitted an estimate of the attorneys' fees and costs accrued in this action. A court will grant a plaintiff's attorneys' fees according to the plaintiff's estimates if it finds that the estimates are based on "a number of hours reasonably expended" and were calculated using a "reasonable hourly rate." *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1517 (D.C. Cir. 1988) (en banc) (citing *Blum v. Stevenson*, 465 U.S. 886 (1984)).

The key factor to determining whether an attorney's time was reasonably expended on a case is productivity. *See Copeland v. Marshall*, 641 F.2d 880, 892 (D.C. Cir. 1980). Work that

is duplicative, excessive, or otherwise unnecessary is not productive. *See id.*; *Martini v. Fed. Nat'l Mortg. Ass'n*, 977 F. Supp. 482 (D.D.C. 1997). In that vein, time expended on claims or motions that ultimately fail is not productive and should not be included in an award of attorneys' fees. *See Copeland*, 641 F.2d at 892.

"[A]n attorney's usual billing rate is presumptively the reasonable rate, provided that the rate is in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993) (quoting *Blum*, 465 U.S. at 895 n.11) (internal quotations omitted). For attorneys in the District of Columbia, the Laffey Matrix sets forth the reasonable range of attorneys' rates based on the respective attorney's level of experience. *Hodel*, 857 F.2d at 1524–25. The United States Attorney for the District of Columbia maintains an updated version of the Laffey Matrix. *See Laffey Matrix 2003–2010*, U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA, http://www.justice.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_8.html (last visited October 14, 2010) [hereinafter *Laffey Matrix*].

Turning to the instant case, plaintiffs seek $127,765.25 in attorneys' fees for Denise M. Clark, Nicole Dafoe, and Michael D. Kirkwood, as well as $4,968.41 in costs. (Pls.' Mot. J. Ex. A, at 3.) Ms. Clark has been practicing law for twenty years and charges an hourly rate of $350; Ms. Dafoe has been practicing law since 2007 and charges an hourly rate of $215; and Mr. Kirkwood has been practicing law since 2005 and charges an hourly rate of $275. (*Id.*) Ms. Clark and Ms. Dafoe charge rates that are lower than those listed in the Laffey Matrix for attorneys with their experience. *See Laffey Matrix*. Mr. Kirkwood charges $5 more per hour than is listed for attorneys with four to seven years of experience. *Id.* The Court finds this

harmless, however, in light of the lower rates charged by Ms. Clark and Ms. Dafoe. The Court therefore finds that the attorneys' rates are reasonable.

The Court also finds that plaintiffs' counsel have expended a reasonable number of hours in this action. The Court has carefully reviewed a breakdown of plaintiffs' counsel's work. The tasks were not duplicative, all tasks arose from this action, and the time counsel expended on each task was not excessive. (*See* Pls.' Mot. J. Ex. 2.) Thus, the Court finds plaintiffs' request for attorneys' fees reasonable and will award them $127,765.25, as well as the $4,968.41 that plaintiffs seek in costs.

## IV. APPORTIONMENT OF LIABILITY

When it granted summary judgment, the Court found that "Donna is an 'employer' under the FLSA and is personally liable for the corporate defendants' wage, overtime, and equal pay violations." (Mem. Op. Granting Pls.' Mot. Summ. J. 7.) With respect to apportioning damages, "if the facts establish that the employee is employed jointly by two or more employers, *i.e.*, that employment by one employer is not completely disassociated from employment by the other employer(s), . . . all joint employers are responsible, both individually and jointly, for compliance with all the applicable provisions of the [FLSA]." 29 C.F.R. § 791.2(a) (2010); *see Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983) ("The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages").

Because the Court has found that Donna is a joint employer under the FLSA and, by extension, under the DCWPCL,[19] he and the corporate defendants are jointly and severally liable for the damages set forth in this opinion. Accordingly, plaintiffs may recover from whichever defendant they choose, and defendants must negotiate amongst themselves how to apportion the damages.

## V. CONCLUSION

For the reasons set forth above, the Court will ORDER defendants to pay damages as follows:

1. To Igor Vuckovic, defendants must pay $31,529.76 in damages and $31,529.76 in liquidated damages.

2. To Arturo Ramos, defendants must pay $17,888.00 in damages and $17,888.00 in liquidated damages.

3. To Bisera Romic, defendants must pay $4,182.00 in damages and $4,182.00 in liquidated damages.

4. To Tulga Dorjgotov, defendants must pay $5,209.60 in damages and $5,209.60 in liquidated damages.

5. To Mohamed Douah, defendants must pay $24,685.29 in damages and $24,685.29 in liquidated damages.

6. To Carlos Sosaya, defendants must pay $16,940.80 in damages and $16,940.80 in liquidated damages.

7. To Marijana Bosnjak, defendants must pay $14,284.60 in damages and $14,284.60 in liquidated damages.

---

[19] Because the DCWPCL and FLSA contain nearly identical provisions with respect to employers' liability, the DCWPCL is construed consistently with the FLSA. *See, e.g.*, *Del Villar v. Flynn Architectural Finishes*, 664 F. Supp. 2d 94, 96 (D.D.C. 2009).

8. To Dorde Milojevic, defendants must pay $13,532.60 in damages and $13,532.60 in liquidated damages.

9. To Jesus Ventura, defendants must pay $21,233.26 in damages and $21,233.26 in liquidated damages.

10. To Rosa Rivas, defendants must pay $29,784.50 in damages and $29,784.50 in liquidated damages.

11. To Hical El Hallou, defendants must pay $7,200.00 in damages and $7,200.00 in liquidated damages.

12. To Elizabeth Scott, defendants must pay $10,609.34 in damages and $10,609.34 in liquidated damages.

13. To Denise M. Clark, Nicole Dafoe, and Michael D. Kirkwood, collectively, defendants must pay $127,765.25 in attorneys' fees, and $4,968.41 in costs.

The Court will DENY plaintiffs' request for prejudgment interest and consequential damages.

A separate order consistent with the memorandum opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on December 3, 2010.